Michael A. Sirignano
Barry I. Levy
John P. Mulvaney
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance*
*Company, GEICO Indemnity Company, GEICO General*
*Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY, and GEICO                      Docket No.:_____ (      )
CASUALTY COMPANY,

                                    Plaintiffs,

               -against-

SHERMAN-ABRAMS LABORATORY, INC., YAKOV
LEYBOVICH, DAVID MOTOVICH, JOHN DOE
DEFENDANTS "1"-"10", and JOHN DOE DEFENDANTS
"11"-"20",

                                    Defendants.
-----------------------------------------------------------------------X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to terminate a massive, on-going fraudulent scheme perpetrated

against GEICO by Defendants who have exploited the New York "No-Fault" insurance system

by submitting more than $2.4 million in fraudulent laboratory services billing to GEICO under

the name Sherman-Abrams Laboratory, Inc. ("Sherman-Abrams").  Specifically, the Defendants submitted, or caused to be submitted, fraudulent claims using the United States mail seeking payment for thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable urine drug screening tests (the "Fraudulent Services") purportedly provided to individuals ("Insureds") who claimed to have been involved in automobile accidents and were eligible for coverage under GEICO no-fault insurance policies.

2.      Defendants Yakov Leybovich and David Motovich are the purported owners of Sherman-Abrams, which has billed GEICO and other New York automobile insurers for the excessive and medically useless Fraudulent Services.

3.      Leybovich and Motovich, along with John Doe Defendants "1"-"10" and John Doe Defendants "11"-"20", perpetrated the fraudulent scheme using illegal referral and kickback arrangements to permit Sherman-Abrams to access a steady stream of New York-based patients, in order to fraudulently bill GEICO and exploit New York's no-fault insurance system for financial gain without regard to genuine patient care.

4.      This action seeks to recover more than $368,000.00 that the Defendants wrongfully obtained from GEICO, and further seeks a declaration that GEICO is not legally obligated to pay reimbursement of more than $1,989,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Sherman-Abrams because:

   (i)      the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

   (ii)     the Fraudulent Services – to the extent that they were provided at all – were illusory and useless as the urine drugs tests were routinely ordered without any documented purpose, and the results of the urine drug screens were routinely not

reviewed for any purported purpose, not incorporated into the Insureds' treatment plans, and played no genuine role in the treatment or care of the Insureds;

(iii)    the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback and referral arrangements in violation of material licensing laws and regulations; and

(iv)    in many cases, the Fraudulent Services were provided – to the extent that they were provided at all – by independent contractors in violation of New York law, and thus are not reimbursable.

5.      The Defendants fall into the following categories:

(i)     Defendant Sherman-Abrams Laboratory Inc. ("Sherman-Abrams") is a New York corporation through which the Fraudulent Services purportedly were performed and were billed to automobile insurance companies, including GEICO.

(ii)    Defendant Yakov Leybovich ("Leybovich") and David Motovich ("Motovich") are the purported owners of Sherman-Abrams.

(iii)   John Doe Defendants "1"-"10" are individuals who "brokered" or "controlled" access to patient referrals in exchange for kickbacks from Sherman-Abrams, its owners, and/or others on its behalf and who spearheaded the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

(iv)    John Doe Defendants "11"-"20" are employees of Sherman-Abrams who participated in the fraudulent scheme by establishing and maintaining kickback relationships with John Doe Defendants "1"-"10" on behalf of Sherman-Abrams in exchange for patient referrals.

6.      As discussed herein, the Defendants at all relevant times have known that (i) the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (ii) the urine drugs tests were routinely ordered without any documented purpose, and the results of the urine drug screens were routinely not reviewed for any purported purpose, not incorporated into the Insureds' treatment plans, and played no genuine role in the treatment or care of the Insureds; (iii) the Fraudulent Services were provided – to the extent that they were provided at all –

3

through the use of illegal kickback and referral arrangements and in violation of material licensing laws and regulations; and (iv) many of the Fraudulent Services were provided – to the extent that they were provided at all – by independent contractors rather than by Sherman-Abrams.

7.      As such, the Defendants do not now have – and have never had – any right to be compensated for the Fraudulent Services that were billed through Sherman-Abrams to GEICO.

8.      The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO.

9.      The Defendants' fraudulent scheme continues uninterrupted through the present day, as Sherman-Abrams continues to seek collection on pending charges for the Fraudulent Services.

10.     As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $368,000.00.

## THE PARTIES

### I.    Plaintiffs

11.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Maryland corporations with their principal place of business in Chevy Chase, Maryland.  GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.   Defendants

12.     Defendants Sherman-Abrams is a New York corporation with its principal place of business in New York.

13.     Sherman-Abrams was incorporated in New York on or about September 16, 1963, is owned and controlled by Leybovich and Motovich, and was used by Leybovich and Motovich as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers in New York.

14.     Pursuant to Sections 574 and 575 of New York State's Public Health Law, Sherman-Abrams performed, or purported to perform, urine drug screens on specimens from individuals in New York pursuant to a permit from the New York State Department of Health.

15.     Sherman-Abrams submitted over $2.4 million in fraudulent billing to GEICO relating to laboratory services purportedly provided to individuals who claimed to have been involved in automobile accidents and were eligible for coverage under New York no-fault insurance policies issued by GEICO.

16.     Defendant Leybovich resides in and is a citizen of New York.  Leybovich owned and controlled Defendant Sherman-Abrams.

17.     Defendant Motovich resides in and is a citizen of New York.  Motovich owned and controlled Defendant Sherman-Abrams.

18.     Upon information and belief, John Doe Defendants "1"-"10" reside in and are citizens of New York.  John Doe Defendants "1"-"10" are individuals, presently not identifiable, who "brokered" or "controlled" access to patients in exchange for kickbacks from Sherman-Abrams, its owners, and/or others on its behalf and who spearheaded the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

19.     Upon information and belief, John Doe Defendants "11"-"20" reside in and are citizens of New York.  John Doe Defendants "11"-"20" are employees of Sherman-Abrams who participated in the fraudulent scheme by establishing and maintaining kickback relationships

with John Doe Defendants "1"-"10" on behalf of Sherman-Abrams in exchange for patient referrals.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

21.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

22.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

23.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391(b)(1), as the Eastern District of New York is the District where one or more of the Defendants reside.

24.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391(b)(2), because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

25.     For example, Sherman-Abrams performed, or purported to perform, urine drug screens on specimens from individuals in the New York metropolitan area under a permit from the New York State Department of Health and submitted all of the fraudulent billing under New York automobile insurance policies issued to GEICO's New York-based Insureds, mailing much of the billing and associated documentation in Brooklyn, New York to GEICO.

26.     Further, in reliance on the fraudulent claims of Sherman-Abrams, many of which were mailed in Brooklyn, New York to GEICO, personnel at a GEICO office in the Eastern District of New York issued payment on the fraudulent claims.

27.     What is more, and as set forth herein, the Defendants transacted substantial business in New York, and derived a substantial amount of revenue based on their fraudulent and unlawful business activities in New York.

## ALLEGATIONS COMMON TO ALL CLAIMS

28.     GEICO underwrites automobile insurance in New York.

## I.      An Overview of the Pertinent Law Governing No-Fault Reimbursement

## A.      Pertinent New York Law Governing No-Fault Insurance Reimbursement

29.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated thereto (11 N.Y.C.R.R. §§ 65, et seq.), automobile insurers are required to provide Personal Injury Protection Benefits ("PIP Benefits" or "No-Fault Benefits") to Insureds.

30.     In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services.

31.     In New York, an Insured can assign his/her right to PIP Benefits to health care goods and services providers in exchange for those services.

32.     In New York, pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known

as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

33.     In the alternative, in New York a healthcare provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500 form").

34.     Pursuant to New York no-fault insurance laws, healthcare services providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services, or if they fail to meet the applicable licensing requirements in any other states in which such services are performed.

35.     For instance, the implementing regulations adopted by the New York Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) stats, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

36.     New York law prohibits clinical laboratories, such as Sherman-Abrams, from paying kickbacks in exchange for patient referrals or splitting fees with healthcare providers.

37.     Section 587 of the New York Public Health Law provides that "[n]o clinical laboratory or its agent, employee or other fiduciaries shall make, offer, give, or agree to make, offer, or give any payment or other consideration in any form to the extent such payment or other consideration is given for the referral of services or participate in the division, transference, assignment, rebate, splitting of fees, with any health services purveyor, or with another clinical laboratory."  See also 10 N.Y.C.R.R. § 34-2.4.

38.     Thus, under New York's no-fault insurance laws, a healthcare services provider, including a clinical laboratory, is not eligible to receive PIP Benefits if it pays kickbacks in exchange for patient referrals.

39.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect PIP Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

40.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

41.     When a healthcare provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonably and medically necessary; and (iii) the service and the attendant fee were not excessive.

42.     Pursuant to New York's no-fault insurance laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect PIP Benefits.  There is both a statutory and regulatory prohibition against payment of PIP Benefits to anyone other than the patient or his/her healthcare services provider.  The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss… directly to the applicant or… upon assignment by the applicant … shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law…

43.     Accordingly, for a healthcare services provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Section 5102(a) of the New York Insurance Law, it must be the underlined actual provider of the services.

44.     Consequently, under New York's no-fault insurance laws, a healthcare services provider may not bill, and is ineligible to collect payment from, an insurer for services rendered by independent contractors.

45.     Pursuant to Section 403 of the New York Insurance Law, the NF-3 forms submitted by healthcare providers to GEICO, and to all other automobile insurers, must be verified by a healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act which is a crime.

46.     Similarly, all HCFA-1500 (CMS-1500) Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

## II.     The Defendants' Fraudulent Scheme

### A.     Overview of the Scheme

47.     Beginning in 2017, and continuing through the present day, Sherman-Abrams, Leybovich, Motovich, John Doe Defendants "1"-"10", and John Doe Defendants "11"-"20" (collectively, the "Defendants"), masterminded and implemented a complex fraudulent scheme in which Sherman-Abrams billed GEICO and other New York automobile insurers millions of

dollars for medically unnecessary, illusory, and otherwise unreimbursable services; specifically qualitative and quantitative urine drug screening tests for an exorbitant amount of drugs for no reason other than to generate profits.

48.     As part of the fraudulent scheme, Leybovich and Motovich sought to maximize the fraudulent billing they could submit or cause to be submitted to GEICO and other insurers by using Sherman-Abrams as a vehicle to submit fraudulent billing for medically unnecessary urine drug screening tests to GEICO and other insurers.

49.     Despite billing GEICO millions of dollars for qualitative and quantitative urine drug screening tests, Sherman-Abrams did not actually perform virtually any of the urine drug screening tests for which it billed.

50.     In fact, Sherman-Abrams is not licensed to perform quantitative urine drug screening tests under its clinical laboratory permit from the New York State Department of Health, A copy of Sherman-Abrams's clinical laboratory permit is annexed hereto as Exhibit "2."

51.     Sherman-Abrams also does not own the complex and costly equipment necessary to render quantitative urine drug screening tests.

52.     To circumvent its lack of proper licensure, Leybovich and Motovich, through Sherman-Abrams, entered into an agreement with Suretox Laboratory Limited Liability Company ("Suretox"), a laboratory in New Jersey, under which Suretox performed all of Sherman-Abrams's quantitative urine drug screening tests and almost all of Sherman-Abrams's qualitative urine drug screening tests.

53.     Suretox performed all of Sherman-Abrams's quantitative urine drug screening tests and almost all of Sherman-Abrams's qualitative urine drug screening tests as an

independent contractor in exchange for nominal fees, in violation of New York's no-fault insurance laws prohibiting the use of independent contractors to render services.

54.     By using Suretox, an independent contractor, to perform quantitative urine drug screening tests for a nominal fee, as opposed to investing in the costly equipment required to render quantitative urine drug screening tests and expending the time and resources necessary to obtain proper licensure to render such tests, Leybovitch and Motovich further maximized the amount of fraudulent billing that could be submitted through Sherman-Abrams to GEICO and other insurers for exorbitant amounts of medically unnecessary urine drug screening test charges.

55.     Indeed, the actual "services" Sherman-Abrams rendered to Insureds, for which it typically billed over $1700.00 per Insured, consisted of little more than transporting the urine specimens to its laboratory for intake of patient information, transporting the urine specimens to Suretox's laboratory in New Jersey for testing, and then generating a report when it received the results from Suretox.

56.     To carry out the fraudulent scheme, Sherman-Abrams also needed referrals of individuals allegedly involved in automobile accidents in New York.

57.     In order to obtain as many patient referrals as possible, Sherman-Abrams, Leybovich, Motovich, and/or John Doe Defendants "11"-"20" entered into illegal financial and referral arrangements with John Doe Defendants "1"-"10", who "brokered" or "controlled" New York-based patients that were treated, or who purported to be treated, first at various medical clinics located throughout the New York metropolitan area and then at various ambulatory surgery centers, anesthesia practices, and interventional pain management practices located in New York and New Jersey.

58.     To facilitate the illegal financial and referral arrangements, Leybovich, Motovich, and/or John Doe Defendants "11"-"20" created standard requisition forms for urine drug screening tests and distributed the forms, through Sherman-Abrams, to the sources of Sherman-Abrams's patient referrals.   As detailed below, Leybovich, Motovich, and/or John Doe Defendants "11"-"20" created Sherman-Abrams's standard requisition forms for the purpose of maximizing the amount of urine drug screening test charges for which Sherman-Abrams could bill to GEICO and other insurers.

59.     The Fraudulent Services billed through Sherman-Abrams were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

**B.      The Defendants' Fraudulent Treatment and Billing Protocol**

60.     In virtually all of the claims identified in Exhibit "1", the Defendants purported to bill for fraudulent and medically unnecessary urine drug screening tests, involving testing for an exorbitant amount of drugs in virtually every urine drug screen test provided, or purported to be provided, to GEICO Insureds.

**1.      Legitimate Use of Urine Drug Screening Tests**

61.     In a legitimate clinical setting, urine drug screening tests are not medically warranted in advance of pain management procedures, routine surgery, or anesthesia services.

62.     In a legitimate clinical setting, urine drug screening tests may be useful in highly select cases, involving more advanced anesthesia services and a higher risk subset of pre-screened patients to determine whether the patient is taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia.

63.     Similarly, in a legitimate clinical setting, urine drug screening tests may be useful in advance of prescribing a controlled substance for chronic pain where there are legitimate indications for chronic opioid treatment, legitimate suspicion that a patient is abusing drugs, or a legitimate question regarding certain medication that a patient is taking, in order to determine whether a patient is taking any medications or using any illicit drugs that might: (i) make them an inappropriate candidate for chronic opioid treatment; or (ii) have a negative interaction with the prescribed medication.

64.     In the very limited situations where a urine drug screening test is warranted, the standard of care for urine drug screening tests first involves the performance of an initial qualitative test -- also known as a "screen" -- which defines the result as "positive" or "negative," indicating the presence or absence of a drug or drug class above the detection threshold of the test.

65.     A qualitative test, in other words, determines whether the drug or a class of drugs is present in a test specimen, not how much of the drug is present.

66.     The purpose of performing qualitative urine drug screening tests is to determine whether any one of several drugs and/or types of drugs is present in the specimen.

67.     In a legitimate clinical setting, qualitative urine drug screening tests are performed to identify and separate unexpected results, which may require additional confirmation via quantitative testing, from expected results, which generally do not require any further testing.

68.     In other words, a qualitative test indicating the presence of a drug that is contained in a medication prescribed to the patient is an expected result, which generally would not require further testing.  Similarly, a qualitative test indicating the absence of illicit drugs or

drugs not contained in medication prescribed to the patient is also an expected result, which generally would not require further testing.

69.     If a qualitative test indicates the presence of an unexpected drug, a confirmation test – which is also known as a quantitative test – may be used to then determine the amount of the drug in the specimen.

70.     A quantitative test may also be used to detect a certain subset of drugs that cannot be detected by an initial qualitative test.

71.     In contrast to qualitative drug testing results – which produces a value of "positive or negative" with respect to a specific drug – quantitative drug testing is a more complex and costly testing process that produces a precise numeric value representing the amount of a specific drug in the specimen.

72.     In the absence of suspected drug use or illicit drug use, routine quantitative testing of illicit drugs or prescription medication is medically unnecessary.  In a legitimate clinical setting, quantitative testing is ordered markedly less frequently and is not ordered in the first instance as a screening test.

73.     For example, absent the finding of a non-prescribed or illicit substance detected during an initial legitimate qualitative urine drug test (i.e. a "positive" result for an unexpected substance), quantitative testing for multiple drugs is not medically necessary unless a practitioner is legitimately testing for specific drugs that cannot be detected by an initial qualitative test.

74.     Accordingly, the routine performance of complex quantitative drug testing for a pre-determined list of drugs is inconsistent with the standard of care and is not medically necessary.

2. **The Fraudulent and Medically Unnecessary Urine Drug Tests Billed for by Sherman-Abrams**

75. In many of the claims identified in Exhibit "1", there was no indication that the Insureds were demographically or medically high risk, abusing drugs, or consuming significant amounts of opioids, benzodiazepines, or other controlled substances.

76. Therefore, in many of the claims identified in Exhibit "1", there was no legitimate question regarding any medications or any illicit drugs that the Insureds may or may not have been taking, and there was no legitimate concern regarding the performance of the routine surgeries that warranted urine drug screens.

77. Even so, in the claims identified in Exhibit "1", the practitioners associated with Sherman-Abrams' referral sources routinely ordered medically unnecessary urine drug screening tests in connection with prescribing pain management medication, performing anesthesia services for routine surgeries, and/or rendering interventional pain management treatment and procedures they purportedly provided.

78. The Defendants then submitted, or caused to be submitted, thousands of urine drug screening test charges, billing millions of dollars, for medically unnecessary tests regularly performed without any indication that the Insureds were taking any unreported medications, using any illicit drugs, or had risk factors warranting such urine drug screening tests.

79. In order to obtain referrals for urine drug screening tests, Leybovich, Motovich, and/or John Doe Defendants "11"-"20" created standard requisition forms for referrals sources to use when ordering urine drug screening tests from Sherman-Abrams.

80. In keeping with the fact that Sherman-Abrams's standard requisition forms were designed for the purpose of generating billing for medically unnecessary urine drug screening

tests, the standard requisition forms created by Defendants included many drugs for which urine drug screening testing would virtually never be warranted in a legitimate clinical setting.

81.    For example, Sherman-Abrams's standard requisition form included quantitative urine drug screens for drugs that are virtually never consumed by the general public, including methylenedioxyethylamphetamine (MDEA), pentazocine, flunitrazepam, and propoxyphene.

82.    Moreover, Sherman-Abrams' standard requisition form included quantitative urine drug screens for drugs that are not drugs of abuse, including midazolam, naltrexone, naloxone, and sufentanil.

83.    Routinely ordering quantitative testing for (i) non-drugs of abuse and (ii) drugs that are virtually never consumed by the general public, is a deviation from the standard of care and is not medically necessary.

84.    Worse, and despite the fact that testing for any such drugs individually would virtually never be medically necessary, Sherman-Abrams's standard requisition forms included boxes for patient referral sources to check to order qualitative and quantitative urine drug screening testing for "ALL DRUGS."

85.    Upon information and belief, the Defendants intentionally and knowingly created a requisition form that included (i) drugs that are not drugs of abuse, (ii) drugs that are virtually never consumed by the general public, and (iii) boxes to perform urine drug screening tests for "ALL DRUGS" listed on the requisition form without regard for whether such urine drug screening tests would be medically necessary and for the purpose of inflating the value of the bills that Sherman-Abrams could submit to insurers, including as GEICO.

86.    Upon information and belief, in order to maximize their fraudulent charges for the medically unnecessary urine drug screens, Sherman-Abrams, through Leybovich, Motovich,

and/or John Doe Defendants "11"-"20", in coordination with John Doe Defendants "1"-"10", required the various referral sources to order the full array of urine drug screening tests listed on Sherman-Abrams's requisition form by checking the "ALL DRUGS" boxes.

87. The standard requisition form that Defendants created served as the basis for Sherman-Abrams to bill for the same set of urine drug screens on every single specimen sent to Sherman-Abrams, regardless of whether or not each particular urine drug screen was medically necessary.

88. In keeping with the fact that Sherman-Abrams's referral sources were required to order the full array of urine drug screening tests by checking the "ALL DRUGS" box on the standard requisition form, Sherman-Abrams' billing submissions to GEICO virtually always included charges for the same fifty-eight (58) to sixty-one (61) separate quantitative urine drug screens.

89. For example:

(i)     Sherman-Abrams submitted a bill to GEICO for, among other things, 58 separate quantitative urine drug screens that were purportedly provided to an Insured named AM on or about October 31, 2019.   Sherman-Abrams billed GEICO $1,753.49 for these 58 separate quantitative urine drug screens.

(ii)    Sherman-Abrams submitted a bill to GEICO for, among other things, 60 separate quantitative urine drug screens that were purportedly provided to an Insured named AK on or about November 28, 2018.   Sherman-Abrams billed GEICO $1,815.11 for these 60 separate quantitative urine drug screens.

(iii)   Sherman-Abrams submitted a bill to GEICO for, among other things, 59 separate quantitative urine drug screens that were purportedly provided to an Insured named KB on or about January 22, 2019.   Sherman-Abrams billed GEICO $1,784.30 for these 59 separate quantitative urine drug screens.

(iv)    Sherman-Abrams submitted a bill to GEICO for, among other things, 61 separate quantitative urine drug screens that were purportedly provided to an Insured named CJ on or about April 9, 2019.  Sherman-Abrams billed GEICO $1,833.58 for these 61 separate quantitative urine drug screens.

(v)     Sherman-Abrams submitted a bill to GEICO for, among other things, 59 separate quantitative urine drug screens that were purportedly provided to an Insured named ED on or about March 29, 2019.  Sherman-Abrams billed GEICO $1,784.30 for these 59 separate quantitative urine drug screens.

(vi)    Sherman-Abrams submitted a bill to GEICO for, among other things, 58 separate quantitative urine drug screens that were purportedly provided to an Insured named EO on or about April 9, 2019.  Sherman-Abrams billed GEICO $1,753.49 for these 58 separate quantitative urine drug screens.

(vii)   Sherman-Abrams submitted a bill to GEICO for, among other things, 59 separate quantitative urine drug screens that were purportedly provided to an Insured named EM on or about October 3, 2018.  Sherman-Abrams billed GEICO $1,784.30 for these 59 separate quantitative urine drug screens.

(viii)  Sherman-Abrams submitted a bill to GEICO for, among other things, 59 separate quantitative urine drug screens that were purportedly provided to an Insured named RH on or about November 5, 2018.  Sherman-Abrams billed GEICO $1,784.30 for these 59 separate quantitative urine drug screens.

(ix)    Sherman-Abrams submitted a bill to GEICO for, among other things, 59 separate quantitative urine drug screens that were purportedly provided to an Insured named MS on or about January 22, 2019.  Sherman-Abrams billed GEICO $1,784.30 for these 59 separate quantitative urine drug screens.

(x)     Sherman-Abrams submitted a bill to GEICO for, among other things, 59 separate quantitative urine drug screens that were purportedly provided to an Insured named WP on or about February 25, 2019.  Sherman-Abrams billed GEICO $1,784.30 for these 59 separate quantitative urine drug screens.

90.     Upon information and belief, the charges for the fifty-eight (58) to sixty-one (61) separate quantitative urine drug screens were based on the standard requisition form established by the Defendants and their direction to various referral sources to order the full array of urine drug screening tests by checking the "ALL DRUGS" boxes listed on the requisition form.

91.     Where medical practitioners associated with Sherman-Abrams ordered urine drug screening tests purportedly in preparation for administering anesthesia services during an upcoming surgery, the surgeries performed were routine, out-patient, arthroscopic orthopedic surgeries for which no urine drug screening tests were medically required under the prevailing

standard of care in order for an anesthesiologist to properly to administer anesthesia to any particular Insured during surgery.

92.    Accordingly, Sherman-Abrams's urine drug screening tests were medically unnecessary and clinically useless in each case where the urine drug screening tests were purportedly ordered in preparation for administering anesthesia services during an upcoming surgery.

93.    Not only were Sherman-Abrams's urine drug screening tests medically unnecessary based on the clinical evaluations and the risk profiles of the Insureds and the procedures they were undergoing, Sherman-Abrams's frequently billed for urine drug screens that were also medically unnecessary because – by the time the results of the urine drug screens were obtained – either: (i) the interventional pain management and anesthesia services had already been performed; or (ii) the referring physician had already issued a prescription for pain management medication.

94.    With respect anesthesia services specifically, patients' urine drug specimens were typically obtained at the surgical center on the day of the procedure, which, by design, made it impossible for any medical practitioner to receive and review Sherman-Abrams's urine drug screening testing results prior to performing the pain management procedure or surgery.

95.    For example:

(i)    On January 16, 2019, an Insured named EE was referred by Laxmidhar Diwan, M.D. – an orthopedic surgeon – to Sherman-Abrams for urine drug screens, ostensibly in connection with anesthesia services that were to be provided to EE on January 16, 2019.  However, the results of the urine drug screen did not arrive until January 19, 2019 – three days after EE received the anesthesia services.

(ii)   On September 12, 2018, an Insured named SW was referred by Jaime Gutierrez, M.D. – an orthopedic surgeon – to Sherman-Abrams for urine drug screens, ostensibly in connection with anesthesia services that were to be provided to SW on September 12, 2018.  However, the results of the urine drug screen did not

arrive until September 18, 2018 – six days after SW received the anesthesia services.

(iii)   On July 12, 2019, an Insured named TK was referred by Francis Rispoli, M.D. – an orthopedic surgeon – to Sherman-Abrams for urine drug screens, ostensibly in connection with anesthesia services that were to be provided to TK on July 12, 2019.  However, the results of the urine drug screen did not arrive until July 16, 2019 – four days after TK received the anesthesia services.

(iv)   On June 29, 2018, an Insured named SR was referred by Sean Thompson, M.D. – an orthopedic surgeon – to Sherman-Abrams for urine drug screens, ostensibly in connection with anesthesia services that were to be provided to SR on June 29, 2018.  However, the results of the urine drug screen did not arrive until July 6, 2018 – seven days after SR received the anesthesia services.

(v)   On January 30, 2019, an Insured named TO was referred by Laxmidhar Diwan, M.D. – an orthopedic surgeon – to Sherman-Abrams for urine drug screens, ostensibly in connection with anesthesia services that were to be provided to TO on January 30, 2019.  However, the results of the urine drug screen did not arrive until February 1, 2019 – two days after TO received the anesthesia services.

(vi)   On February 14, 2019, an Insured named JG was referred by Mark Gladstein, M.D. to Sherman-Abrams for urine drug screens, ostensibly in connection with a prescription for pain management medication that was to be provided to JG on February 14, 2019.  However, the results of the urine drug screen did not arrive until February 18, 2019 – four days after JG filled the prescription for pain management medication.

(vi)   On April 12, 2019, an Insured named TJ was referred by Yury Koyen, M.D. to Sherman-Abrams for urine drug screens, ostensibly in connection with a prescription for pain management medication that was to be provided to TJ on April 12, 2019.  However, the results of the urine drug screen did not arrive until April 16, 2019 – four days after TJ filled the prescription for pain management medication.

(viii)   On August 16, 2019, an Insured named MH was referred by Augustus Igbokwe, P.A. to Sherman-Abrams for urine drug screens, ostensibly in connection with a prescription for pain management medication that was to be provided to MH on August 17, 2019.  However, the results of the urine drug screen did not arrive until August 19, 2019 – two days after MH received the prescription for pain management medication.

(ix)   On January 18, 2019, an Insured named MS was referred by Laxmidhar Diwan, M.D. to Sherman-Abrams for urine drug screens, ostensibly in connection with a prescription for pain management medication that was to be provided to MS on January 23, 2019.  However, the results of the urine drug screen did not arrive

until January 24, 2019 – one day after MS filled the prescription for pain management medication.

(x)     On February 14, 2019, an Insured named LD was referred by August Igbokwe, P.A. to Sherman-Abrams for urine drug screens, ostensibly in connection with a prescription for pain management medication that was to be provided to LD on February 14, 2019.  However, the results of the urine drug screen did not arrive until February 18, 2019 – four days after LD filled the prescription for pain management medication.

96.     These are only representative examples.  In the claims identified in Exhibit "1", the practitioners associated with Sherman-Abrams' referral sources routinely ordered medically unnecessary urine drug screens that were billed through Sherman-Abrams, and the results of the urine drug screens were not provided until after the Insured received the pertinent anesthesia services or prescription for pain management medication.

97.     In keeping with the fact that the urine drug screens were medically unnecessary, in virtually all of the claims identified in Exhibit "1", the putative "results" of the Defendants' urine drug screens were not incorporated into the Insureds' treatment plan, played no genuine role in the treatment or care of the Insureds, and no one responded to the irregularities on the urine drug tests even when illicit drugs were reported.

98.     In fact, after providing a urine specimen and undergoing surgery on the same day, several Insureds unexpectedly (i.e., contrary to their known prescriptions and reported medical history) tested positive for illicit drugs or alcohol in quantities indicating that the Insured had used such drugs or consumed alcohol near in time to the surgery.

99.     In keeping with the fact that Sherman-Abrams's urine drug screening tests were ordered and performed pursuant to pre-determined protocols and without regard to patient care, the medical practitioners virtually never reviewed, commented on, or acted on any patient's

unexpected positive test results for illicit drugs or alcohol, whether prior to or after conducting any surgery.

100.   Indeed, for pain management procedures or surgeries performed the same day or within a few days of when a urine specimen was taken, it was typically impossible for a practitioner to have received the results of the urine drug screening tests due to the delay inherent in Sherman-Abrams's process for urine drug screening tests, due to the fact that Suretox, and not Sherman-Abrams, had actually performed the urine drug screening tests.

101.   Specifically, Sherman-Abrams would first have to be informed by the medical office or surgical center that there was a urine specimen to be collected and then a driver employed by Sherman-Abrams would collect the urine specimen and transport it by car to Sherman-Abrams's laboratory in Brooklyn, New York for intake and processing.   Once Sherman-Abram's intake and processing was complete, the urine specimen would be transported again by car to Suretox's laboratory in Elmwood Park, New Jersey for Suretox to intake and process the urine specimen for performance of qualitative and quantitative urine drug screening testing.

102.   Had the medical practitioners reviewed the positive urine drug screening test results they received from Sherman-Abrams prior to performing any pain management procedure or surgery, the medical practitioners would have, under the prevailing standard of care, been required to discuss the findings with their patients, document the risks and benefits of going forward with the surgery in light of the positive test results, and/or cancel the planned procedure.

103.   In many cases, the scheduled surgeries should have been cancelled based on the tests results because the nature of the positive test results indicated serious health risks to the

Insured.   However, because profit, and not patient care, was the primary motivator for the Defendants and the associated medical practitioners, the Insureds' surgeries went forward as planned regardless of the availability of urine drug screening test results.

104.   Under the circumstances employed by the Defendants, the urine drug screens amounted to the purposeful performance of useless, illusory and unnecessary urine drug screens solely to generate profits without regard to any patient need.

105.   Further, in order to maximize their profits from the fraudulent charges for the medically unnecessary urine drug screens, Sherman-Abrams frequently billed for medically unnecessary complex, quantitative urine drug screens, ostensibly to confirm the results of contemporaneous qualitative drug screens with negative results.

106.   For example:

(i)   On or about October 15, 2019, Sherman-Abrams purported to provide medically unnecessary quantitative urine drug screens to an Insured named GD, despite the fact that contemporaneous qualitative urine drug screens had produced negative results.

(ii)   On or about July 26, 2019, Sherman-Abrams purported to provide medically unnecessary quantitative urine drug screens to an Insured named RD, despite the fact that contemporaneous qualitative urine drug screens had produced negative results.

(iii)   On or about October 10, 2019, Sherman-Abrams purported to provide medically unnecessary quantitative urine drug screens to an Insured named GF, despite the fact that contemporaneous qualitative urine drug screens had produced negative results.

(iv)   On or about September 26, 2019, Sherman-Abrams purported to provide medically unnecessary quantitative urine drug screens to an Insured named VH, despite the fact that contemporaneous qualitative urine drug screens had produced negative results.

(v)   On or about May 28, 2019 Sherman-Abrams purported to provide medically unnecessary quantitative urine drug screens to an Insured named TW, despite the fact that contemporaneous qualitative urine drug screens had produced negative results.

(vi)     On or about August 16, 2018, Sherman-Abrams purported to provide medically unnecessary quantitative urine drug screens to an Insured named HB, despite the fact that contemporaneous qualitative urine drug screens had produced negative results.

(vii)    On or about September 7, 2018, Sherman-Abrams purported to provide medically unnecessary quantitative urine drug screens to an Insured named ME, despite the fact that contemporaneous qualitative urine drug screens had produced negative results.

(viii)   On or about August 14, 2018, Sherman-Abrams purported to provide medically unnecessary quantitative urine drug screens to an Insured named HL, despite the fact that contemporaneous qualitative urine drug screens had produced negative results.

(ix)     On or about October 3, 2018, Sherman-Abrams purported to provide medically unnecessary quantitative urine drug screens to an Insured named LW, despite the fact that contemporaneous qualitative urine drug screens had produced negative results.

(x)      On or about June 29, 2018, Sherman-Abrams purported to provide medically unnecessary quantitative urine drug screens to an Insured named SR, despite the fact that contemporaneous qualitative urine drug screens had produced negative results.

107.    These are only representative examples.  In the claims identified in Exhibit "1", Sherman-Abrams routinely billed for medically unnecessary quantitative urine drug screens despite the fact that contemporaneous qualitative urine drug screens had produced negative results, thereby inflating its charges for urine drug testing by over $1700.00 per test.

108.    Again, under the circumstances employed by the Defendants, the performance of the complex, quantitative urine drug screens amounted to the purposeful performance of useless, illusory, and unnecessary urine drug screens solely to generate profits without regard to any patient need.

C.       **The Illegal Kickback and Referral Relationships**

109.    Sherman-Abrams needed a constant flow of patient referrals in order to bill for the Fraudulent Services.

110.    Around the time Sherman-Abrams began submitting billing to GEICO in 2017, Sherman-Abrams began hiring several employees who were formerly employed by Shiel Medical Laboratory ("Shiel"), a laboratory company that ceased to exist when its then-parent company Fresenius Medical Care Holdings, Inc. ("FMCH") sold Shiel's assets to Quest Diagnostics, Inc. in December 2017.

111.    According to reports FMCH publicly filed with the Securities and Exchange Commission, Shiel's operations are currently under investigation by the United States Attorney's Office for the Eastern District of New York for violations of the False Claims Act.   By way of example, the relevant portion of FMCH's Form 20-F filing dated February 20, 2020 is annexed hereto as Exhibit "3."

112.    Specifically, in responding to a subpoena regarding the matter, FMCH admitted that it "identified falsifications and misrepresentations in documents submitted by a Shiel salesperson that relate to the integrity of certain invoices submitted by Shiel for laboratory testing."  See Exhibit "3."

113.    Critically, FMCH learned that the Government's investigation includes "a range of issues involving Shiel, including allegations of improper compensation (kickbacks) to physicians" and that "multiple sealed qui tam complaints underlie the investigation." See id.

114.    In September 2017, Sherman-Abrams hired a former Shiel employee to be its Chief Operating Officer.

115.    Sherman-Abrams continued to hire former Shiel employees in 2018 and 2019, including salespersons, coinciding with significant increases in the amount Sherman-Abrams billed to GEICO.

116.    Upon information and belief, John Doe Defendants "11"-"20" included individuals employed by Sherman-Abrams as salespersons, who Sherman-Abrams paid on a commission basis and therefore had substantial financial incentive to participate in the illegal kickback scheme.

117.    In order to obtain as many patient referrals as possible, Sherman-Abrams, through Leybovich, Motovich, and/or John Doe Defendants "11"-"20", entered into illegal financial arrangements with John Doe Defendants "1"-"10", who "brokered" or "controlled" New York-based patients that were treated, or who purported to be treated, at various ambulatory surgery centers, anesthesia practices, and interventional pain management practices located in New York and New Jersey.

118.    Pursuant to the direction of John Doe Defendants "1"-"10", various healthcare practitioners referred Insureds to Sherman-Abrams for medically unnecessary urine drug screens, ostensibly in connection with either: (i) anesthesia services that would purportedly be provided to an Insured; or (ii) a prescription for pain management medication that would purportedly be provided to an Insured.

119.    Sherman-Abrams, through Leybovich, Motovich, and/or John Doe Defendants "11"-"20", made the various kickback payments in exchange for having Insureds referred to Sherman-Abrams for the medically unnecessary Fraudulent Services, regardless of the individual's symptoms, presentment, or actual need for additional treatment.

120.     The amount of kickbacks paid by Sherman-Abrams, through Leybovich, Motovich, and/or John Doe Defendants "11"-"20", was based on the volume of Insureds that were referred to Sherman-Abrams for the purported Fraudulent Services.

121.     Absent the payment of kickbacks, Sherman-Abrams' referrals sources would not refer patients to Sherman-Abrams for the medically unnecessary urine drug screens, as evidenced by the facts that there was no clinical utility to the urine drug screening tests ordered and that Sherman-Abrams routinely generated the results of the urine drug screen test after the pertinent Insured had either: (i) already received the pertinent anesthesia services; or (ii) already received the pertinent prescription for pain management medication.

122.     The Defendants at all times knew that the kickbacks and referral arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme, including the particular amounts paid for the kickbacks.

123.     Nevertheless, based on the circumstances surrounding the arrangements with the referral sources, Sherman-Abrams, through Leybovich, Motovich, and/or John Doe Defendants "11"-"20", paid a financial kickback for each of the particular referrals made for the Fraudulent Services.  The payment of the kickbacks was made at or near the time the referrals were issued.

124.     The unlawful kickback and payment arrangements were essential to the success of the Defendants' fraudulent scheme.  The Defendants derived significant financial benefit from the relationships because without access to the Insureds, the Defendants would not have the ability to execute the fraudulent treatment and billing protocol and bill GEICO and other insurers.

**D.    The Fraudulent Billing for Independent Contractor Services**

125.    The Defendants' fraudulent scheme also included submission of claims to GEICO on behalf of Sherman-Abrams seeking payment for services performed by an independent contractor, Suretox.

126.    Under the New York no-fault insurance laws, a healthcare service provider is ineligible to bill for or receive payment for goods or services provided by independent contractors, as the healthcare services must be provided by the healthcare service provider itself or by its employees.

127.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that healthcare service providers are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS). See Exhibit "4."

128.     In the context of laboratories such as Sherman-Abrams, this general principle is reinforced by Ground Rule 3 of the Pathology and Laboratory Section of the NY Fee Schedule, which states that "when the service or procedure is performed by other than the attending physician, be it hospital, commercial, or other laboratory, only the laboratory rendering the service may bill and such shall be submitted directly to the responsible payer." (emphasis added).

129.     Virtually all of the qualitative urine drug screening tests and all of the quantitative urine drug screening tests for which Sherman-Abrams billed GEICO were performed by Suretox.

130.     Indeed, as noted above, Sherman-Abrams is not permitted to perform quantitative urine drug screening tests under its clinical laboratory permit from the New York State Department of Health, nor does Sherman-Abrams own the complex and costly equipment necessary to render such services. See Exhibit "2."

131.     In virtually all of the urine drug screening tests that Sherman-Abrams billed to GEICO, Sherman-Abrams did little more than collect the test specimen, transport it to Suretox, generate a templated report based on the results from Suretox, distribute that report to the referring provider, and then bill for the urine drug screening services that Suretox performed on its behalf.

132.     Suretox is a clinical laboratory that operates in New Jersey.

133.     Suretox performed urine drug tests for specimens provided by Sherman-Abrams as an independent contractor pursuant to an executed agreement between the two entities.

134.     In the claims identified in Exhibit "1", Sherman-Abrams routinely falsely represented that it was entitled to be reimbursed for urine drug screens purportedly performed by

Suretox, when in fact it was not, because: (i) the claims were submitted under New York automobile insurance policies, seeking reimbursement for Sherman-Abrams under the New York no-fault insurance laws; but (ii) Suretox was an independent contractor for Sherman-Abrams.

**E.  The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

135.   To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and reports through Sherman-Abrams to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

136.   The NF-3 forms, HCFA-1500 forms, and treatment reports submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i)   The NF-3 forms, HCFA-1500 forms, and reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary.  In fact, the Fraudulent Services were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

(ii)   The NF-3 forms, HCFA-1500 forms, and reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were provided for patient care.  In fact, the Fraudulent Services were illusory as the results of the urine drug screens were routinely not reported or reviewed for their purported intended purpose, not incorporated into the Insureds' treatment plans, and played no genuine role in the treatment or care of the Insureds.

(iii)   The NF-3 forms, HCFA-1500 forms, and reports submitted by and on behalf of the Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback and referral arrangements amongst the Defendants and others.

(iv)   With the exception of NF-3 forms, HCFA-1500 forms, and reports covering services actually performed by Sherman-Abrams, the NF-3 forms, HCFA-1500 forms, and reports submitted by, and on behalf of, the Defendants uniformly misrepresented to GEICO that the Defendants were

eligible to receive PIP Benefits under New York no-fault insurance policies.  In fact, the Defendants were not eligible to seek or pursue collection of PIP Benefits for the services that supposedly were performed because the services were provided, to the extent they were provided at all, by independent contractors.

### III.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

137.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

138.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

139.    Specifically, the Defendants knowingly misrepresented and concealed facts related to Sherman-Abrams in an effort to prevent discovery of the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

140.    Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

141.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed – to the extent they were performed at all – pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

142.    In addition, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that many of the Fraudulent Services were actually provided by independent contractors rather than by Sherman-Abrams.

143.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers.  These law firms routinely filed expensive and time-consuming collection actions against GEICO and other insurers if the charges were not promptly paid in full. The collection actions that the Defendants have commenced to collect on their fraudulent claims, which often continue for years, were commenced in New York and seek to collect No-Fault Benefits under GEICO's New York automobile insurance policies for Fraudulent Services that they purported to provide to GEICO's New York-based Insureds.

144.    GEICO is under statutory and contractual obligations to promptly and fairly process claims.  The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and omissions described above, were designed to and did cause GEICO to rely upon them.

145.    As a result, GEICO has incurred damages of more than $368,000.00 based upon the fraudulent charges representing payments made by GEICO to Sherman-Abrams.

146.    Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### AS AND FOR A FIRST CAUSE OF ACTION
**Against Sherman-Abrams**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

147.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

148.    There is an actual case and controversy between GEICO and Sherman-Abrams regarding more than $1,989,000.00 in fraudulent billing for the Fraudulent Services that have been submitted to GEICO through Sherman-Abrams.

149.    Sherman-Abrams has no right to receive payment for any pending bills submitted to GEICO under its name because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

150.    Sherman-Abrams has no right to receive payment for any pending bills submitted to GEICO under its name because the Fraudulent Services– to the extent that they were provided at all – were illusory and useless as the results of the urine drug screens were routinely not reported or reviewed for their purported intended purpose, not incorporated into the Insureds' treatment plans, and played no genuine role in the treatment or care of the Insureds.

151.    Sherman-Abrams has no right to receive payment for any pending bills submitted to GEICO under its name because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others.

152.    Sherman-Abrams has no right to receive payment for any pending bills for services submitted to GEICO under its name where those services were provided by independent contractors.

153.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Sherman-Abrams has no right to receive payment for any pending bills submitted to GEICO under its name.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Against Leybovich and Motovich**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

154.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

155.    Sherman-Abrams is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

156.    Leybovich and Motovich knowingly conducted and/or participated, directly or indirectly, in the conduct of Sherman-Abrams' affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for approximately two years seeking payments that Sherman-Abrams was not entitled to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; and; (iii) the billed-for-services were illusory and useless and played no genuine role in the treatment or care of the Insureds; (iv) Sherman-Abrams obtained its patients through the Defendants' illegal kickback scheme; and (v) the billed-for-services were performed by independent contractors and not Sherman-Abrams. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

157.    Sherman-Abrams' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail

fraud are the regular way in which Leybovich and Motovich operate Sherman-Abrams, insofar as Sherman-Abrams is not engaged in a legitimate clinical laboratory business, the services billed to GEICO were unnecessary and illusory, and the testing was performed for no reason other than to generate profits.  Therefore, acts of mail fraud are essential in order for Sherman-Abrams to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by Sherman-Abrams to the present day.

158.    Sherman-Abrams is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Sherman-Abrams in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

159.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $368,000.00 pursuant to the fraudulent bills submitted through Sherman-Abrams.

160.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A THIRD CAUSE OF ACTION
**Against Leybovich, Motovich, John Doe Defendants "1"-"10",
and John Doe Defendants "11"-"20"
(Violation of RICO, 18 U.S.C. § 1962(d))**

161.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

162.    Sherman-Abrams is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

163.    Leybovich, Motovich, John Doe Defendants "1"-"10", and John Doe Defendants "11"-"20" are employed by or associated with the Sherman-Abrams enterprise.

164.    Leybovich, Motovich, John Doe Defendants "1"-"10", and John Doe Defendants "11"-"20" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Sherman-Abrams' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for approximately two years seeking payment that Sherman-Abrams was not eligible to receive under New York no-fault insurance law because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services were illusory and useless and played no genuine role in the treatment or care of the Insureds; (iv) Sherman-Abrams obtained its patients through the Defendants' illegal kickback scheme; and (v) the billed-for-services were performed by independent contractors and not Sherman-Abrams.  The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of

racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

165.    Leybovich, Motovich, John Doe Defendants "1"-"10", and John Doe Defendants "11"-"20" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

166.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $368,000.00 pursuant to the fraudulent bills submitted through Sherman-Abrams.

167.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Against Leybovich, Motovich, and Sherman-Abrams
### (Common Law Fraud)

168.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

169.    Leybovich, Motovich, and Sherman-Abrams intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges through Sherman-Abrams seeking payment for the Fraudulent Services.

170.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were medically necessary and eligible for PIP reimbursement, when in fact they were not medically

necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (ii) in every claim, the representation that the Fraudulent Services were provided for patient care and eligible for PIP reimbursement, when in fact the billed-for-services played no genuine role in the treatment or care of the Insureds; (iii) in every claim, the representation that Sherman-Abrams and the Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement, when in fact, the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others; and (iv) in the overwhelming majority of claims, the representation that Sherman-Abrams and the Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement, when in fact, the Fraudulent Services were provided – to the extent that they were provided at all – by independent contractors rather than by Sherman-Abrams.

171.    Leybovich, Motovich, and Sherman-Abrams intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Sherman-Abrams that were not compensable under the New York no-fault insurance laws.

172.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $368,000.00 pursuant to the fraudulent bills submitted by the Defendants through Sherman-Abrams.

173.    Leybovich, Motovich, and Sherman-Abrams' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

174.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Against John Doe Defendants "1"-"10" and John Doe Defendants "11"-"20"
### (Aiding and Abetting Fraud)

175.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

176.    John Doe Defendants "1"-"10" and John Doe Defendants "11"-"20" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Leybovich, Motovich, and Sherman-Abrams.

177.    The acts of John Doe Defendants "1"-"10" in furtherance of the fraudulent scheme included, among other things, knowingly steering Insureds to Sherman-Abrams in exchange for illegal kickbacks from Leybovich, Motovich, and Sherman-Abrams and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol designed to maximize profits without regard to patient care.

178.    The acts of John Doe Defendants "11"-"20" in furtherance of the fraudulent scheme included, among other things, knowingly obtaining relationships with patient referral sources, including John Doe Defendants "1"-"10", paying illegal kickbacks on behalf of Leybovich, Motovich, and Sherman-Abrams, and assisting in subjecting the Insureds to a

predetermined fraudulent treatment protocol designed to maximize profits without regard to patient care.

179.    The conduct of John Doe Defendants "1"-"10" and John Doe Defendants "11"-"20" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1"-"10" and John Doe Defendants "11"-"20" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Leybovich, Motovich, and Sherman-Abrams to obtain payment from GEICO and other insurers.

180.    John Doe Defendants "1"-"10" and John Doe Defendants "11"-"20" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Sherman-Abrams for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

181.    The conduct of John Doe Defendants "1"-"10" and John Doe Defendants "11"-"20" caused GEICO to pay more than $368,000.00 pursuant to the fraudulent bills submitted through Sherman-Abrams.

182.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

183.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**Against Leybovich, Motovich, and Sherman-Abrams**
**(Unjust Enrichment)**

184.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

185.    As set forth above, Leybovich, Motovich, and Sherman-Abrams have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

186.    When GEICO paid the bills and charges submitted by or on behalf of Sherman-Abrams for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Leybovich, Motovich, and Sherman-Abrams' improper, unlawful, and/or unjust acts.

187.    Leybovich, Motovich, and Sherman-Abrams have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Leybovich, Motovich, and Sherman-Abrams voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

188.    Leybovich, Motovich, and Sherman-Abrams' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

189.    By reason of the above, Leybovich, Motovich, and Sherman-Abrams have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $368,000.00.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a judgment be entered in their favor:

A.     On the First Cause of Action against Sherman-Abrams, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Sherman-Abrams has no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against Leybovich and Motovich, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $368,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Leybovich, Motovich, John Doe Defendants "1"-"10" and John Doe Defendants "11"-"20", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $368,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.     On the Fourth Cause of Action against Leybovich, Motovich, and Sherman-Abrams, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $368,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

E.     On the Fifth Cause of Action against John Doe Defendants "1"-"10" and John Doe Defendants "11"-"20", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $368,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper; and

F.     On the Sixth Cause of Action against Leybovich, Motovich, and Sherman-Abrams more than $368,000.00 in compensatory damages, plus costs, interest, and such other and further relief as this Court deems just and proper.

Dated:  November 4, 2020
       Uniondale, New York

                    RIVKIN RADLER LLP

                    By:   */s/ Michael A. Sirignano*
                          Barry I. Levy
                          Michael A. Sirignano
                          John P. Mulvaney
                    926 RXR Plaza
                    Uniondale, New York 11556
                    (516) 357-3000   RR File:  5100-3071
                    *Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*